HULL, Circuit Judge:
In this § 1983 excessive force case, While Santonio Manders sued Sheriff Winston Peterson in his official capacity for injuries allegedly caused by the Sheriffs use-of-force policy at the jail and failure to train and discipline his deputies in that regard. We conclude that Sheriff Peterson functions as an “arm of the State” in establishing use-of-foree policy at the jail and in training and disciplining his deputies in *1306 that regard, and is entitled to Eleventh Amendment immunity for these particular functions. Thus, we reverse the district court’s denial of summary judgment for Sheriff Peterson.
I.BACKGROUND

A. Facts

As the elected sheriff, defendant Sheriff Peterson is responsible for the operation of the jail in Clinch County, Georgia, for establishing use-of-force policy at the jail, and for hiring, training, and disciplining his deputies who work in the jail. Sheriff Peterson’s deputy and chief jailer is Alan Brown. In May 1997, police officers from the City of Homerville arrested plaintiff Manders and transported him to the jail.[1] Because Manders had punched a police officer, the arresting officers charged him with felony obstruction of an officer, in violation of Georgia law, O.C.G.A. § 16-10-24(b).
As Manders was escorted into the jail’s holding cell, a City police officer stated that Manders “hit him” earlier. According to Manders, Deputy Brown and a City police officer then repeatedly struck him across the head, neck, and face and banged his head against a wall. Manders suffered a bruised, swollen face. The beating affected him emotionally, resulting in a mental hospital stay.
The morning after the beating, Manders wrote a statement for jail officials, wherein he stated: “They had to be rough with me to let me know that they mean business.” That same day, Manders was released from jail. Afterwards, Manders’s mother met with Sheriff Peterson to discuss the beating. According to Manders’s mother, Sheriff Peterson responded to her concerns this way: “[T]hat happens sometimes when they bite and scratch.” Sheriff Peterson did not investigate the beating incident. In his deposition, Manders later testified that Sheriff Peterson and another officer forced him to write his statement.
Manders’s evidence also included the Policy and Procedure Manual (the “Manual”) of the Sheriffs Office containing the Sheriffs use-of-force policy. Sheriff Peterson published the Manual in 1989 or 1990, drafting some policies himself and adopting some State policies. The Manual requires that “[ejach case involving physical or defensive force be reported in writing to the Sheriff:”[2]
(A) Notification of Supervisor
1. The Sheriff shall be immediately informed of each incident involving the use of force by officers of this Department. Such notification shall be on the same date of the incident.
2. Each case involving physical or defensive force shall be reported in writing to the Sheriff.
3. Each officer present or assisting in an arrest or incident requiring force shall be prepared to submit a report supplement describing the incident if requested.
In addition to the report requirement, the Manual discusses both non-deadly and deadly force by an officer in the performance of his duties. The Manual provides that non-deadly force may be used by an officer in these situations:
1. When necessary to preserve the peace,’ prevent commission of of *1307 fenses, or prevent suicide or self-inflicted injury.
2. When preventing or interrupting a' crime or attempted crime against property.
3. When making lawful arrests and searches, overcoming resistance to such arrest and searches, and preventing escapes from custody.
4. When in self defense, or defense of another against unlawful violence to his person.
The Manual also details when deadly force is justified. Sheriff Peterson has no other written or standard operating procedures for the use of force at the jail.

B. Amended Complaint

In this § 1983 case, Manders’s amended complaint claims that defendants Clinch County and Sheriff Peterson, in his official capacity, are responsible for use-of-force policy at the jail, for training and disciplining deputies who work at the jail, and for ensuring that the policy is followed.[3] According to Manders, Deputy Brown beat him, and Clinch County and Sheriff Peterson permitted Brown’s use of excessive force at the jail. Manders also asserts that Clinch County and Sheriff Peterson failed to provide deputies proper training and supervision regarding use of force at the jail and failed to promulgate adequate rules to regulate deputies’ conduct at the jail. Manders asserts that these failures caused his beating. Manders sought damages against Clinch County and Sheriff Peterson in his official capacity.[4]
The district court denied defendants’ motion for summary judgment on Manders’s § 1983 damage claims against Clinch County and Sheriff Peterson in his official capacity for the use-of-force policy at the jail and the training and disciplining of deputies in that regard.[5] Sheriff Peterson alone filed this interlocutory appeal, claiming that he is a state actor and that the district court erred in denying him Eleventh Amendment immunity.[6] This appeal does not address the individual liability of Sheriff Peterson or his deputies *1308 for using excessive force.[7] Instead, this appeal involves only the immunity of Sheriff Peterson in his official capacity.
II. THE ELEVENTH AMENDMENT

A. Immunity from Suit in Federal Court

The Eleventh Amendment provides immunity by restricting federal courts’ judicial power:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
U.S. Const, amend. XI. The Eleventh Amendment protects a State from being sued in federal court without the State’s consent.[8] As a result, parties with claims against a non-consenting State must resort to the State’s own courts. The Eleventh Amendment is “a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will.” McClendon v. Georgia Dep’t of Cmty. Health, 261 F.3d 1252, 1256 (11th Cir. 2001).
It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an “arm of the State” is sued. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). To receive Eleventh Amendment immunity, a defendant need not be labeled a “state officer” or “state official,” but instead need only be acting as an “arm of the State,” which includes agents and instrumentalities of the State. See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Whether a defendant is an “arm of the State” must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. See Shands Teaching Hosp. & Clinics v. Beech St Corp., 208 F.3d 1308, 1311 (11th Cir. 2000) (“The pertinent inquiry is not into the nature of [an entity’s] status in the abstract, but its function or role in a particular context.”). The particular functions at issue are Sheriff Peterson’s force policy *1309 at the jail and the training and disciplining of his deputies in that regard.[9]

B. Eleventh Amendment Factors

In Eleventh Amendment cases, this Court uses four factors to determine whether an entity is an “arm of the State” in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm., 226 F.3d 1226, 1231-34 (11th Cir.2000); Shands, 208 F.3d at 1311; Tuveson v. Fla. Governor’s Council of Indian Affairs, Inc., 734 F.2d 730, 732 (11th Cir. 1984).
Given these factors, the resolution of the Eleventh Amendment issue in this case depends, in part, on state law. Therefore, before applying the four-factor test, we must examine Georgia law and the relationship among Sheriff Peterson, the State, and Clinch County. The issue of whether an entity is an “arm of the State” for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law. Thus, we now journey through Georgia’s legal terrain at some length.[10]
III. GEORGIA LAW
We first examine the governmental structure of Sheriff Peterson’s office vis-a-vis the State and Clinch County under Georgia law. Next, we outline the functions Sheriff Peterson performs as they reflect the character of his office. Then we apply the Eleventh Amendment factors to the sheriffs functions in issue: promulgating force policy and training and disciplining deputies in that regard.

*1310
A. Georgia’s Governmental Structure

Georgia’s Constitution has created the sheriffs office as an elected constitutional office in Georgia’s governmental hierarchy. Ga. Const, art. IX, § 1, ¶ 1. The sheriffs office is not a division or subunit of Clinch County or its county governing body, and, thus, it is not a structural part of Clinch County government. See id.; Ga. Const, art. IX, § 2, ¶ 1(c)(1). Rather, the sheriffs office is a separate constitutional office independent from Clinch County and its governing body. See Ga. Const, art. IX, § 2, ¶ 1(c)(1).
Further, Georgia’s Constitution grants the State legislature the exclusive authority to establish and to control a sheriffs powers and duties. Ga. Const, art. IX, § 1, ¶ 3(a)-(b).[11] Interpreting this constitutional provision, the Georgia Supreme Court has explained that sheriffs are subject to the control of the Georgia legislature and are not county employees. Bd. of Comm’rs of Randolph County v. Wilson, 260 Ga. 482, 482, 396 S.E.2d 903 (1990) (“The sheriff ... is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission.”); see Chaffin v. Calhoun, 262 Ga. 202, 203, 415 S.E.2d 906 (1992); Warren v. Walton, 231 Ga. 495, 499-500, 202 S.E.2d 405 (1973).
In contrast to the State’s authority and control over sheriffs, Georgia’s Constitution grants counties no legislative power or authority over sheriffs and expressly prevents counties from controlling or affecting the sheriffs office or the personnel thereof.[12] Gá. Const, art. IX, § 2, ¶ 1(c)(1). In this regard, the Georgia Supreme Court has concluded that this constitutional restriction on the legislative power granted to counties-home rule-prevents counties from taking action affecting the sheriffs office. Warren, 231 Ga. at 499, 202 S.E.2d 405;[13] see Stephenson v. Bd. of Comm’rs of Cobb County, 261 Ga. 399, 401-02, 405 S.E.2d 488 (1991). As a result, counties exercise no authority or control over the sheriffs force policy, whether in making arrests on the streets or in quelling disruptive inmates at the jail.
Further, in Georgia, counties also do not delegate any of their governmental or police powers to sheriffs. Instead, the sheriffs’ authority and duties are derived *1311 directly from the State. That counties delegate no power or authority to sheriffs further explains why counties have no authority or control over them and why the sheriff is not a subunit or division of county government.
Georgia law likewise makes the county entity itself, here Clinch County, a separate entity independent of the sheriffs office. Under Georgia law, Clinch County is a “body corporate” capable of suing and being sued and is headed by the county governing authority. Ga. Const, art. IX, § 1, ¶ 1 (“Each county shall be a body corporate and politic with such governing authority ... as provided by law.”); O.C.G.A. §§ 36-1-3 (“Every county is a body corporate, with power to sue or be sued in any court.”), l-3-3(7) (defining “County governing authority” as “the board of county commissioners, the sole county commissioner, or the governing authority of a consolidated government”). As a separate entity, Clinch County is headed by its Board of Commissioners, which is given “exclusive jurisdiction over and control of county affairs.” Ga. Laws 1933, p. 467, § 29. In contrast, under Georgia’s Constitution, the State has exclusive authority and control over the duties and affairs of the sheriffs office. Although the State requires the county to fund the sheriffs budget, Georgia’s Constitution precludes the county from exereis-ing any authority over the sheriff, including how the sheriff spends that budget. Ga. Const. art. IX, § 2, ¶ 1(c)(1); Chaffin v. Calhoun, 262 Ga. 202, 203-04, 415 S.E.2d 906 (1992); see Boswell v. Bramlett, 274 Ga. 50, 52, 549 S.E.2d 100 (2001).
The separate and distinct nature of Sheriff Peterson’s office and Clinch County, and their independence from each other, are further demonstrated by how Georgia law treats sheriffs’ employees. Sheriffs alone hire and fire their deputies. See O.C.G.A. § 15-16-23. Deputies, including those serving as jailers, are employees of the sheriff and not the county. Warren, 231 Ga. at 499, 202 S.E.2d 405 (recognizing that “[djeputy sheriffs and deputy jailors are employees of the sheriff, whom the sheriffs alone are entitled to appoint or discharge”) (quotation marks omitted); Drost v. Robinson, 194 Ga. 703, 710, 22 S.E .2d 475 (1942); Brown v. Jackson, 221 Ga.App. 200, 201, 470 S.E.2d 786 (1996) (noting deputy sheriffs “were employees of the sheriff and not Peach County”); Wayne County v. Herrin, 210 Ga. App. 747, 751, 437 S.E.2d 793 (1993); Pettus v. Smith, 174 Ga.App. 587, 588, 330 S.E.2d 735 (1985); see Boswell, 274 Ga. at 51, 549 S.E.2d 100 (“[Ejmployees of constitutionally elected officers of a county are considered employees of the elected officer and not employees of the county, as represented by the local governing authority.”); Mobley v. Polk County, 242 Ga. 798, 801-02, 251 S.E.2d 538 (1979).[14]
*1312 Because sheriffs are elected by county voters, it is not surprising that Georgia’s Constitution labels sheriffs as “county officers.” Ga. Const, art. IX, § 1, ¶ 3(a). But, given how Georgia’s Constitution also makes the sheriffs office a constitutional office independent from the county entity itself, precludes all county control, and grants only the State control over sheriffs, this “county officer” nomenclature necessarily reflects a geographic label defining the territory in which a sheriff is elected and mainly operates. It is entirely consistent for sheriffs to be independent of the county government and to be subject to State, not county, control but to be called “county officers” to reflect their geographic jurisdiction in the State.
Having established that Sheriff Peterson’s office is independent from Clinch County and its governing authority and that only the State controls and grants powers and duties to sheriffs, we next examine the functions of the sheriffs office under Georgia law. The specific tasks that sheriffs perform also shed considerable light on the character of the sheriffs office under Georgia law.

B. Sheriff’s Functions

As noted above, counties cannot, and do not, grant any law enforcement power to sheriffs and do not assign or control any of the sheriffs’ duties. Instead, the State alone has delegated to sheriffs specific duties in three main areas: (a) law enforcement; (b) state courts; and (c) corrections. While we ultimately decide today only whether Georgia sheriffs wear a “state hat” in prescribing use-of-force policy, we outline the duties the State has assigned to sheriffs as they reflect the character of the sheriffs office under Georgia law. What duties the State assigns sheriffs is indicia of how the State defines that entity.

1. Law Enforcement

In Georgia, the office of sheriff is as old as the State of Georgia itself and carries with it the common law duties of sheriffs to enforce the laws and preserve the peace on behalf of the sovereign State, as well as other specific statutory duties imposed by the State legislature. O.C.G.A. § 15-16-10(a)(1) — (8); Hannah v. State, 212 Ga. 313, 92 S.E.2d 89 (1956) (“The office of sheriff carries with it ... all of its common-law duties and powers, except as modified by statute.”) (citation and quotation marks omitted).[15] Given the sheriffs continuing common law duties, the State legislature mandates that it is the express duty of the sheriff to perform not only “such ... duties as are or may be imposed by law,” *1313 but also those duties “which necessarily appertain to his or her office.” O.C.G.A. § 15-16-10(a)(8).
Georgia’s Constitution also provides that “[t]he Governor shall take care that the laws are faithfully executed and shall be the conservator of the peace throughout the state.” Ga. Const, art. V, § 2, ¶ 2. In enforcing the laws and conserving the peace, the Georgia Governor does not act alone, but necessarily acts through state agents, which include sheriffs for certain state functions.[16] The United States Supreme Court recently acknowledged that sheriffs historically had geographic restrictions but in reality “represented the State in fulfilling [their] duty to keep the peace.” McMillian v. Monroe County, 520 U.S. 781, 793, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (concluding that Alabama sheriffs act for the state as to the law enforcement function in issue). The Supreme Court reflected on the longstanding historical role of sheriffs, as follows:
As the basic forms of English government were transplanted in [the United States], it also became the common understanding here that the sheriff, though limited in jurisdiction to his county and generally elected by county voters, was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace.
Id. at 794, 117 S.Ct. 1734 (internal footnote omitted). Indeed, “in conserving the public peace, in vindicating the law, and in preserving the rights of the government, [the sheriff] represents the sovereignty of the State and he has no superior in his county.” 1 W. Anderson, A Treatise on the Law of Sheriffs, Coroners and Constables 5 (1941), cited with approval in McMillian, 520 U.S. at 794, 117 S.Ct. 1734.
As we already have noted, sheriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs.[17] In Georgia, this historical role of the sheriff thus continues to this day as the sheriff directly represents the sovereignty of the State, has no superior in his county, and performs state functions for the sovereign in enforcing the laws and keeping the peace.
It is also entirely consistent for Georgia sheriffs to be elected by county voters and be called “county officers” to reflect their geographic jurisdiction, but for them still to act on behalf of the State in enforcing the laws and keeping the peace in that jurisdiction. See R. Cooley, Handbook on the Law of Municipal Corporations 512 (1914) (“Sheriffs ... clerks and other so-called county officers are properly state officers for the county. Their functions and duties pertain chiefly to the affairs of state in the county.”).[18]
*1314 ¡2. State Courts
In addition to imposing certain law enforcement duties, the State has assigned sheriffs specific duties in the State’s superior courts.[19] Superior courts are the State’s trial courts of general jurisdiction. See Ga. Const, art. VI, § 4, ¶ 1; O.C.G.A. § 15-6-8.[20] That sheriffs perform an integral role in the state judicial system is further indicia of how sheriffs act for the State.
The State mandates that sheriffs must attend “all sessions” of superior courts in their respective counties and “never ... leave [court] without the presence of himself or his deputy.” O.C.G.A. § 15-16-10(a)(2). The State also mandates that sheriffs must execute and return the processes and orders of the state courts. O.C.G.A. § 15-16-10(a)(l). Sheriffs also must publish sales, citations, and other proceedings as required by law, keep an execution docket, keep a book of all sales made by process of state courts, and keep many other specified records. O.C.G.A. § 15 — 16—10(a)(4)—(6). This same statute provides that “[i]f any sheriff or deputy fails to comply with any provision of [O.C.G.A. § 15-16-10(a)], he shall be fined for a contempt.” O.C.G.A. § 15 — 16—10(b). Thus, the State directs sheriffs to enforce state court orders and punishes them if they do not. The superior court clerk also delivers to the sheriff or his deputy a “precept containing the names of the persons drawn as grand jurors,” and the sheriff or his deputy serves the summons on each grand juror in person or by mailing, as determined by the sheriff. O.C.G.A. § 15-12-65.[21]
The State also has assigned sheriffs the function of determining which companies may make bonds in their jurisdictions. O.C.G.A. § 17-6-15. While state judges decide whether a county jail inmate, charged with a felony, is entitled to bond, sheriffs approve bonding companies in their counties for the State’s criminal cases. Sheriffs must “publish and make available written rules and regulations defining acceptable sureties and prescribing under what conditions sureties may be accepted.” O.C.G.A. § 17-6-15(b)(l). The State also prescribes the qualifications of “professional bondspersons.” O.C.G.A. § 17-6-50. The State in effect “places the authority to accept sureties in felony cases in the office of the sheriff and not in the superior court.”[22] Jarvis v. J&J Bonding *1315 Co., 239 Ga. 213, 215, 236 S.E.2d 370 (1977) (construing Georgia Code § 27-418 (1933), which is the precursor to O.C.G.A. § 17-6-15).
The State also requires sheriffs to “deposit cash bonds held by the sheriff in one or more interest-bearing trust accounts,” O.C.G.A. § 15-16-27(a), and to remit that interest to a state agency, the Georgia Indigent Defense Council. O.C.G.A. §§ 15-16-27(b), 17-12-32. That Council then redistributes the money to local indigent defense programs. O.C.G.A. §§ 15-16-27(b), 17-12-30 et seq.[23]
These state court and bond-related duties do not stem from laws of general application, but from statutes whereby the State requires sheriffs to perform specific tasks that are state functions in the State’s criminal justice system. These statutes are not mere general regulatory control. Instead, they represent the State delegating discrete state functions in the State’s criminal justice system specifically to sheriffs.

3. Corrections

The State also assigns sheriffs specific corrections duties regarding state offenders. The State requires that the sheriff take custody of all inmates in the jail in his county. O.C.G.A. § 42-4-4. The Georgia legislature mandates that “[i]t shall be the duty of the sheriff ... [t]o take from the outgoing sheriff custody of the jail and the bodies of such persons as are confined therein” and to furnish inmates “medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury.” O.C.G.A. § 42-4-4(a)(l)-(2). Sheriff Peterson’s authority and duty to administer the jail in his jurisdiction flows from the State, not Clinch County. See In re Irvin, 254 Ga. 251, 253, 328 S.E.2d 215 (1985) (“It is clear that the legislature has vested broad authority in the office of sheriff to administer the jails.”). Sheriffs who refuse to take custody of an inmate may be charged with a misdemeanor. O.C.G.A. § 42-4-12.
It is important to outline how the State uses county jails to incarcerate its state offenders and, in turn, requires sheriffs to administer them. To begin with, sheriffs must take custody of inmates arrested and awaiting trial in state superior courts on state felony and misdemeanor charges.[24] No sheriffs approval is required. For example, a City of Homerville police officer arrested plaintiff Manders for felony obstruction of an officer — in violation of state law, O.C.G.A. § 16-10-24(b) — and took Manders to the Clinch County jail.
As custodians of pre-trial detainees charged with state felonies, sheriffs transfer inmates to and from the State’s superi- *1316 or courts for pre-trial and trial proceedings, as well as attend all sessions of those courts. If a change of venue for the trial is granted by the state trial judge, the sheriff must transport the person to the county to which the change of venue is directed and deliver that person to the sheriff of that county. O.C.G.A. § 42-4-11.
Another class of inmates in the county jails are those serving state sentences for felonies. When convicted of a felony offense, the felon by operation of Georgia law is committed to the custody of the Georgia Department of Corrections (“DOC”), which determines the place of confinement. O.C.G.A. §§ 42 — 5—50(b), 42-5 — 51(b).[25] In at least five situations, convicted felons serve their state sentences in county jails.
First, a convicted felon, although in DOC custody, serves his state felony sentence in the county jail pending appeal if his attorney certifies his presence is necessary for the appeal. O.C.G.A. § 42-5-50(c). No sheriff or DOC approval is required.[26] The DOC’s regulations even provide that the State will pay for the cost of maintaining felony prisoners in county jails after conviction and sentencing until their appeals are concluded. Ga. Comp. R. & Regs. § 125-2-4-.02(d).[27]
Second, due to prison overcrowding, the DOC has broad discretion to assign convicted felons to serve their state sentences in county jails and to reimburse counties for their incarceration at a daily rate.[28] The state trial court must notify the DOC that a person is convicted of a felony within thirty days. O.C.G.A. § 42-5-50(a). The DOC then has fifteen days to elect to transfer the inmate or to start paying for his incarceration. O.C.G.A. § 42-5-51(c). No sheriffs approval is required.
Third, if a convicted felon’s state probation is revoked, a state judge has discretion to sentence the felon to serve his state sentence in the county jail in certain circumstances. O.C.G.A. § 17-10-l(a)(3)(A). No sheriffs approval is required.
Fourth, convicted felons serving a paroled state sentence, under the DOC’s authority, who violate parole may be held in county jails until a state judge formally revokes their state parole. Ga. Op. Atty. *1317 Gen. No. 82-33 (1982). No sheriffs approval is required.
Fifth, convicted felons in DOC custody-may serve their state sentences in county jails if they are participating in a state-sponsored project and the sheriff approves. O.C.G.A. § 42 — 5—51(d).
Yet another class of inmates in county jails are those serving state misdemeanor sentences. If a defendant is convicted of a state misdemeanor offense, the state judge has discretion to sentence the defendant to, among other locations, the “county jail.”[29] O.C.G.A. § 17 — 10—3(a)(1)—(3).
Because the State uses the statewide network of county jails to incarcerate its felony and misdemeanor offenders, it is not surprising that the State expressly authorizes sheriffs to act beyond their respective counties and to transfer prisoners to the county jails of other sheriffs.[30] In addition to venue changes, the State requires sheriffs to take persons arrested to a jail of another county if the sheriffs county jail is in an “unsafe condition.” O.C.G.A. § 42-4-4(a)(3).[31]
The State also permits sheriffs to exercise their discretion to “transfer[ ] a prisoner to another jail in another county if the sheriff concludes that such transfer is in the best interest of the prisoner or that such transfer is necessary for the orderly administration of the jail.” O.C.G.A. § 42-4-4(b). In a similar vein, “[wjhen there is no secure jail in a county or when it is deemed necessary by the sheriff, any person committing an offense in the county may be sent to a jail in another county determined to be suitable by the sheriff.” O.C.G.A. § 17-7-1.[32]
Given sheriffs’ significant corrections role for state offenders, the State further requires sheriffs to keep detailed records of persons committed to county jails. *1318 O.C.G.A. § 42-4-7. These records include the “age, sex, race, under what process such person was committed and from what court the process issued, the crime with which the person was charged, the date of such person’s commitment to jail, the day of such person’s discharge, under what order such person was discharged, and the court from which the order issued.” O.C.G.A. § 42-4-7(a). The State mandates that a sheriff or a deputy who fails to comply with these state requirements shall be fined for contempt and subject to removal from office. O.C.G.A. § 42-4-4(c).
In sum, these requirements are not state laws of general application but represent the State’s managing and controlling where state offenders are incarcerated, designating that certain state offenders serve state time in county jails, and then assigning sheriffs specific corrections duties regarding those state offenders.[33] In contrast, counties have no authority over what corrections duties sheriffs perform, or which state offenders serve time in county jails, or who is in charge of the inmates in the county jails.[34]
IV. APPLYING ELEVENTH AMENDMENT FACTORS
Having examined Georgia’s law governing sheriffs, we now specifically apply the Eleventh Amendment factors to *1319 Sheriff Peterson’s particular functions in issue. We need not, and do not, decide today whether Georgia sheriffs wear a “state hat” for Eleventh Amendment purposes for all of the many specific duties assigned directly by the State. We have recounted these duties as relevant Georgia law that reflects on the nature and character of the sheriffs office. We, however, must decide here only whether Sheriff Peterson is an “arm of the State” in establishing force policy at the jail and in training and disciplining his deputies in that regard.

A. How State Law Defines the Entity

The first factor in the Eleventh Amendment analysis is how Georgia law defines the sheriffs office. In Georgia, the office of sheriff is an elected constitutional office. Although a sheriff performs his duties mainly, although not always, within the geographical confines of a county, the essential governmental nature of his office is (a) to continue to perform his historical common law duties to enforce the law and preserve the peace on behalf of the sovereign State and (b) to perform specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections. Most of those duties are an integral part of the State’s criminal justice system and are state functions.
Moreover, the sheriffs office is a separate and independent office from both Clinch County and its governing body. Counties delegate no powers or duties to sheriffs. Sheriff Peterson and his deputies at the jail are not employees of Clinch County. Indeed, Georgia’s Constitution precludes Clinch County from having any control over the sheriffs office.
Although the specific duties the State assigns to sheriffs shed considerable light on' the character of the sheriffs office, we must focus on the nature of the particular function at issue here: force policy. The sheriffs authority to use force or the tools of violence, whether deadly or non-deadly force, and the sheriffs obligation to administer the jail are directly derived from the State and not delegated through the county entity. In addition, use of force and creating force policy are quintessential policing functions, exercised by sheriffs in initial arrests, in subduing inmates in sessions of state superior courts, or in quelling disruptive inmates in county jails.
While we must consider context, the location where the sheriffs policing function is performed does not automatically transmute the function into a state function or a county function. In administering the jail, the sheriff does not check his arrest powers or force authority at the door. Instead, he and his deputies bring them into the jail and exercise them in the jail setting. This case is not a case of feeding, clothing, or providing medical care to inmates, which necessarily occur within the jail. Instead, it involves Sheriff Peterson’s force policy, which happens to be at issue in the jail context in this particular case. While the jail context is important, it likewise is significant that the sheriffs force policy is at issue in many settings and that location alone does not control. It is also material that the State uses the county jail to incarcerate not only pretrial detainees charged with state offenses, such as Man-ders, but also state offenders serving state sentences after conviction.
Based on our review of Georgia law, we conclude that the sheriff wears a “state hat” when he creates and implements force policy in the jail.[35] Thus, this first factor weighs heavily in favor of immunity.

*1320
B. Where State Law Vests Control

The second factor of the Eleventh Amendment analysis examines where Georgia law vests control. In addition to mandating and controlling sheriffs’ specific duties as outlined above, only the State possesses control over sheriffs’ force policy and that control is direct and significant in many areas, including training and discipline.

1. State Requires Annual Training of Sheriffs

The State requires annual specialized training of sheriffs in all counties by the Georgia Sheriffs’ Association with the assistance of the Georgia Public Safety Training Center.[36] O.C.G.A. § 15-16-3. The annual training of sheriffs “shall be generally devoted to contemporary law enforcement, investigation, judicial process, and corrections practices and specifically shall be germane to the ... office of sheriff in the several counties of this state.” O.C.G.A. § 15-16-3(a). The “purpose of this Code section [O.C.G.A. § 15-16-3] is to promote professionalism within the office of sheriff by ensuring the highest possible quality of law enforcement training is offered to each sheriff on an annual basis.” O.C.G.A. § 15 — 16—13(a). It is reasonable to assume that such training includes instruction on force policy and hiring and training deputies. Sheriff Peterson testified that in preparing the force policy in his Manual he adopted some state policies. Furthermore, the Georgia Sheriffs’ Association uses state funds (or federal funds distributed to the State) to cover all training costs. See O.C.G.A. § 15 — 16—3(d).
Notably, if a sheriff fails to comply with the annual training requirements, the Governor — the State’s chief — may suspend the sheriff without pay for ninety days. O.C.G.A. § 15 — 16—3(e)(4). The State also mandates that a sheriffs failure to complete annual training requirements will result in the loss of arrest powers. O.C.G.A. *1321 § 15 — 16—8(e)(l),(4). Again, these rules are not laws of general application, but are specific statutes whereby the State directly requires annual training of all sheriffs, controls the training subject matter, pays for the training, and sanctions sheriffs for non-compliance. In contrast, counties have no control over sheriffs or their training.

2. Governor Disciplines Sheriffs

In addition, the Governor has broad investigation and suspension powers regarding any misconduct by a sheriff in the performance of any of his duties. O.C.G.A. § 15-16-26.[37] If a sheriffs policy permits excessive force in the county jail, plainly the Governor may discipline the sheriff. If a sheriff fails to take custody of state offenders in the county jail, plainly the Governor may discipline the sheriff. The State legislature expressly has made Sheriff Peterson answerable to the Governor for his conduct and policies.
Specifically, the Governor may initiate an investigation of any suspected misconduct by any sheriff and may suspend the sheriff. O.C.G.A. § 15-16-26(a), (c). The Governor selects two sheriffs, who along with the State Attorney General, conduct the investigation for the Governor. O.C.G.A. § 15-16-26(a). The State funds the investigation. Id.
If the Governor’s committee recommends suspension to the Governor, the Governor may suspend the sheriff for sixty days and extend that suspension for thirty additional days. O.C.G.A. § 15-16-26(c). This disciplinary procedure is direct, substantial, and immediate state control over the sheriffs acts. If Sheriff Peterson permits excessive force, all the Governor must do is have a committee immediately investigate and report, and the Governor can suspend him.[38]
Moreover, if the Governor believes the sheriff should be removed from office, the Governor is “authorized to request the district attorney of the county of the sheriffs residence to bring a removal petition against the sheriff’ based upon the evidence reported by the Governor’s investigation committee.[39] Id. The Governor may order additional investigation “by the committee, by the Georgia Bureau of Investigation, by other law enforcement agencies ... or by any special committee appointed by the Governor for such purpose.” O.C.G.A. § 15 — 16—26(c).

*1322
3. Counties Lack Control

In contrast, counties have no authority, control over, or involvement in Sheriff Peterson’s force policy at the jail, or his training and disciplining of deputies in that regard. While Georgia counties have obligations involving the jail structure and inmates’ food, clothing, and medical necessities, such duties involve wholly separate and distinct matters from the sheriffs force policy at the jail and his training and disciplining of deputies in that regard.[40]
Because of the State’s direct and substantial control over the sheriffs duties, training, and discipline and the county’s total lack thereof, this control factor also weighs heavily in favor of Sheriff Peterson’s entitlement to Eleventh Amendment immunity.[41]

*1323
C. Funds

The third factor in the Eleventh Amendment analysis is where the entity derives its funds. The State funds the annual training of sheriffs, funds the Governor’s disciplinary procedure over sheriffs for use of excessive force, and pays for certain state offenders assigned to the county jails under the sheriffs supervision.[42] Thus, state funds are involved to some extent in the particular functions of Sheriff Peterson at issue.
While Clinch County bears the major burden of funding Sheriff Peterson’s office and the jail, it is because the State so mandates. By state statutes, Clinch County must (1) maintain the jail structure, (2) appropriate funds for necessities to inmates (such as food, bedding, clothing, electricity, and sanitation) and the salaries of Sheriff Peterson and his deputies, and (3) pay the premium for the Sheriffs official bond. O.C.G.A. §§ 36-9-5, 42-5-2(a), 15-16-20, 45-4-7.
Manders relies on O.C.G.A. § 42-5-2(a), which provides, in part, that “it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention.”[43] But Manders does not allege that Sheriff Peterson denied him necessities in O.C.G.A. § 42-5-2. Rather, Manders challenges only Sheriff Peterson’s force policy at the jail and the training and disciplining of his deputies.
Furthermore, Clinch County’s financial control is attenuated because (a) the State mandates Sheriff Peterson’s minimum salary and official bond amount, and (b) Clinch County sets the total budget but cannot dictate how Sheriff Peterson spends it. The Georgia Supreme Court has held that counties “must provide reasonably sufficient funds to allow the sheriff to discharge his legal duties,” and that “the county commission may not dictate to the sheriff how that budget will be spent in the exercise of his duties.” Chaffin v. Calhoun, 262 Ga. 202, 203-04, 415 S.E.2d 906 (1992);[44] see Boswell v. Bramlett, 274 Ga. 50, 52, 549 S.E.2d 100 (2001). Georgia’s Constitution further prevents counties from taking any action affecting any *1324 elective county office or the personnel thereof. Ga. Const, art. IX, § 2, ¶ 1(c)(1).
Payment of Sheriff Peterson’s budget, when required by the State, does not establish any control by Clinch County over his force policy at the jail or how he trains and disciplines deputies.[45] By virtue of State mandates, both state and county funds are involved in the particular functions in issue. This state involvement is sufficient to tilt the third factor of the Eleventh Amendment analysis toward immunity.

D. Liability for and Payment of Adverse Judgments

The fourth factor is the source of the funds that will pay any adverse judgment against Sheriff Peterson in his official ca-parity. Before applying this factor, we discuss three recent cases addressing it.
In Hess v. Port Authority Trans-Hudson Corf., 513 U.S. 30, 35-39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Supreme Court denied Eleventh Amendment immunity to an interstate railway-port authority, created under the U.S. Constitution’s Interstate Compact Clause and controlled by the federal government and two states. Because the federal government was one of the “multiple creator-controllers,” the five-justice majority in Hess concluded that the states had ceded a portion of their sovereignty to Congress and that having the “Compact Clause” entity respond in federal court did not affront “the dignity” of the states. Id. at 47, 115 S.Ct. 394. Hess further concluded that “both legally *1325 and practically” neither state was obligated to pay any judgment against the entity. Id. at 51-52, 115 S.Ct. 394. Rather, the entity was financially independent, with funds from private investors, tolls, fees, and investment income. Id. at 36, 49-50, 115 S.Ct. 394. Although weighing this source-of-payment factor heavily, Hess never suggests that for Eleventh Amendment immunity a state treasury drain is required per se and Hess notes that “current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system.” Hess, 513 U.S. at 39,115 S.Ct. 394[46]
The focus of the Supreme Court in Regents of the University of California v. Doe, 519 U.S. 425, 430-31, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), was on “potential legal liability” and “the risk of adverse judgments,” as opposed to requiring that state funds actually pay the judgment. In Regents, the federal government indemnified a state university, and the litigation had “no impact” on the state treasury. Id. Nevertheless, the Supreme Court determined that this full indemnity did not affect the university’s immunity. Id. The Supreme Court emphasized that “[t]he Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party,” and “it is the entity’s potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant.” Id. at 431, 117 S.Ct. 900.[47]
*1326 Thereafter, this Court applied these principles in Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp., granting immunity to private corporations that contracted with the state to administer its health insurance program and to provide a network of medical services. 208 F.3d at 1310-11, 1313. We stated that “although these are private corporations that are neither controlled nor funded by the state, they are protected by governmental immunity when they are clearly acting as agents of the state.” Id. at 1311. Noting that other circuits had not adopted an approach of total or no immunity, Shands looked to the relief sought and whether the judgment against the private corporation “would implicate the state treasury or interfere with the administration of [a] state ... program.” Id. Given that the State could be sued for the negligence of the agent corporations in untimely paying claims, we determined that the judgment against the private corporations “would implicate state funds” and that the private corporations would indemnify the state was immaterial. Id. at 1313.
Applying these principles to this case, we first determine that under Georgia law Clinch County would not pay a damages award against Sheriff Peterson. Georgia courts speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions or misconduct of the sheriff or his deputies and is not required to pay the resulting judgments.[48] Likewise, Georgia courts have concluded that counties are not liable for, and not required to give sheriffs money to pay, judgments against sheriffs in civil rights actions. See Wayne County Bd. of Comm’rs v. Warren, 236 Ga. 150, 152, 223 S.E.2d 133 (1976) (“[A] county has no liability in connection with the violations of the civil rights of any person by a county officer.”). The Georgia Supreme Court in Warren quoted a Georgia statute stating that “[a] county is not hable to suit for any cause of action unless made so by statute.” Id. at 151, 223 S.E.2d 133 (quotation marks omitted).[49] Thus, by statute, the county *1327 was not liable. In addition, the Georgia Supreme Court concluded that “there is no duty of the county to furnish the sheriff with money to settle a civil rights judgment entered against him.” Id. at 152, 223 S.E.2d 133.[50]
Although Clinch County is not required to pay and although Sheriff Peterson argues that “the ‘legal liability’ for sheriffs in Georgia rests with the State of Georgia, not individual counties,” we can locate no Georgia law expressly requiring the State to pay an adverse judgment against Sheriff Peterson in his official capacity. Sheriff Peterson thus apparently would have to pay any adverse federal court judgment against him in his official capacity out of the budget of the sheriffs office. In turn, this payment would reduce his budget, and the practical reality is that Sheriff Peterson must recoup that money from somewhere. If a significant adverse judgment occurs, both county and state funds are implicated because Sheriff Peterson would need to seek a greater total budget from the county for his office and a greater daily rate from the State for felony offenders serving their state sentences in the county jail.
Never has the Supreme Court required an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity.[51] See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55; Hess, 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245; Shands, 208 F.3d 1308. This is because the Eleventh Amendment “is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty,” and a purpose of the Eleventh Amendment is to “accord[] the States the respect owed them as members of the federation” and not to affront the “dignity” or “integrity” of a state by requiring a state to respond to lawsuits in federal courts. Hess, 513 *1328 U.S. at 39 — 40, 115 S.Ct. 394 (citation and quotation marks omitted). “[C]urrent Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system.” Id. at 39, 115 S.Ct. 394. The State’s “integrity” is not limited to who foots the bill, and, at a minimum, the liability-for-adverse-judgment factor does not defeat Sheriff Peterson’s immunity claim.
V. CONCLUSION
Having applied the Eleventh Amendment factors, we conclude that Sheriff Peterson in his official capacity is an arm of the State, not Clinch County, in establishing use-of-force policy at the jail and in training and disciplining his deputies in that regard.[52] Therefore, Sheriff Peterson is entitled to Eleventh Amendment immunity in this case.[53] We need not answer, and do not answer, today whether Sheriff Peterson wears a “state hat” for any other functions he performs. We conclude only that he does as to the limited functions at issue in this case.
The first two factors weigh heavily in favor of immunity, and the third factor tilts that way as well. Sheriffs’ duties and functions are derived directly from the State, performed for the State, and controlled by the State. The State of Georgia has exercised its managerial prerogative: (a) to incarcerate state offenders, pretrial and post-conviction, in county jails, among other locations; (b) to assign sheriffs certain specific state functions in law enforcement, state courts, and corrections, including making sheriffs in charge of state offenders in county jails; (c) to control sheriffs’ duties, train sheriffs in those duties, and discipline sheriffs; (d) to preclude any county control over sheriffs but nonetheless require counties to fund the jail structure and sheriffs’ budgets; and (e) for the State to pay for sheriffs’ training and discipline, as well as certain state offenders in the county jail. Given these principles of Georgia law, we conclude that sheriffs act for the State, not counties, as to the functions in issue.[54]
*1329 As to the final fourth factor in the Eleventh Amendment analysis, although the State and the county are not required to pay an adverse judgment against the sheriff, both county and state funds indirectly are implicated. In any event, the State’s sovereignty and thus its integrity remain directly affected when federal court lawsuits interfere with a state program or function. At a minimum, this final factor does not defeat immunity.
Accordingly, we reverse the district court’s order denying Sheriff Peterson’s motion for summary judgment and remand this case to the district court for proceedings consistent with this opinion.
REVERSED AND REMANDED.

. We recount the evidence in the light most favorable to Manders, the nonmoving party, on a summary judgment motion. Harbert Int’l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir.1998).

. Deputy Brown never submitted a written report indicating he used force with Manders. Sheriff Peterson never required Brown to do so even after having met with Manders's mother.

. The parties and the district court litigated this lawsuit against Sheriff Peterson as if all of Manders’s § 1983 claims against Clinch County also were made against Sheriff Peterson in his official capacity. Thus, we decide the case as one in which the amended complaint purports to sue Sheriff Peterson in his official capacity for use-of-force policy and for failing to train and discipline Deputy Brown in that regard. See Marsh v. Butler County, 268 F.3d 1014, 1023-24 n. 4 (11th Cir.2001) (en banc).

. At no time has Manders made a claim against Sheriff Peterson’s official bond, which Georgia law requires sheriffs to post, O.C.G.A. § 15-16-5, and we do not address such a claim.

. The district court granted summary judgment (1) to Sheriff Peterson individually on all claims, (2) to Clinch County and Sheriff Peterson in his official capacity on Manders’s § 1983 claim for the negligent hiring of Deputy Brown, and (3) to Clinch County and Sheriff Peterson on Manders’s injunctive relief claims. Manders did not appeal or cross-appeal these rulings.

.Although Clinch County also asserts that Sheriff Peterson acts for the State and is not a county policymaker, Clinch County did not appeal because it could not at this time. When a county appeals asserting that a sheriff is not a county policymaker under § 1983, that presents a defense to liability issue for the county over which we do not have interlocutory jurisdiction. Swint v. Chambers County Comm'n, 514 U.S. 35, 43, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). In contrast, when a sheriff in his official capacity appeals interlocutorily asserting Eleventh Amendment immunity, this presents a threshold immuni-1y-from-suit issue over which we have jurisdiction. See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); Swint, 514 U.S. at 42-43, 115 S.Ct. 1203; Grech v. Clayton County, 335 F.3d 1326, 2003 WL 21521761 (11th Cir.2003) (en banc).

. It is argued that the majority opinion "badly subverts the law,” makes sheriffs "immune from suit,” and renders a "substantial blow” to citizens being able to hold officials accountable for constitutional violations. (Dissent, Barkett, J., pp. 1332, 1347). As noted above, this case involves only the sheriff "in his official capacity” and does not affect in any way claims against sheriffs or their deputies in their individual capacities. See Hafer v. Melo, 502 U.S. 21, 30-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983.”); Hobbs v. Roberts, 999 F.2d 1526, 1528 (11th Cir. 1993) (noting that Eleventh Amendment immunity does not extend to " 'individual' or personal’ capacity suits in federal court”); Gamble v. Fla. Dep’t of Health & Rehabilitative Servs., 779 F.2d 1509, 1512-13 (11th Cir. 1986) ("[T]he Eleventh Amendment provides no bar to federal court adjudication of suits against state officers individually.”).

. "Although the express language of the [Eleventh] [Ajmendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens.” Carr v. City of Florence, 916 F.2d 1521, 1524 (11th Cir. 1990) (citing Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). "[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.” Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

. See Tuveson v. Fla. Governor's Council of Indian Affairs, Inc., 734 F.2d 730, 734 (11th Cir.1984) (noting "the functions of the Council” are significant to Eleventh Amendment analysis): cf. McMillian v. Monroe County, 520 U.S. 781, 785-86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (instructing that the question is not whether the sheriff acts for the county or state "in some categorical, ‘all or nothing’ manner!; 1” rather the question of whether the sheriff acts for the county or state requires attention to the sheriff's role "in a particular area, or on a particular issue”); Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 45, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (noting "Port Authority functions are not readily classified as typically state or unquestionably local”).
Although the majority opinion focuses only on the particular function of Sheriff Peterson in establishing force policy at the jail and training and disciplining his deputies, the dissent criticizes this functional approach and defines the Sheriff’s conduct at a higher level of abstraction with "jail operation as the pertinent function.” (Dissent, Barkett, J., p. 1337). We disagree because the dissent’s characterization of the function at issue is too broad; the relevant question is not whether Sheriff Peterson acts for the State or Clinch County in some categorical all or nothing manner in connection with the county jail. Instead, the proper inquiry is whether Sheriff Peterson acts for the State or Clinch County in the particular functions at issue today.

. We focus on Georgia law, as opposed to how other circuits treat sheriffs under other states’ laws, because states have extremely wide latitude in determining their forms of government and how state functions are performed, and because significant for our case is how the Georgia Supreme Court has treated sheriffs in Georgia and interpreted the provisions of Georgia law in issue. See Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (noting that the Eleventh Amendment question "can be answered only after considering the provisions of state law that define the agency’s character”); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (stating that whether an entity is entitled to Eleventh Amendment immunity "depends, at least in part, upon the nature of the entity created by state law").

. Georgia's Constitution provides that sheriffs "shall be elected by the qualified voters of their respective counties for terms of four years and shall have such qualifications, powers, and duties as provided by general law.” Ga. Const, art. IX, § 1, ¶ 3(a). That paragraph also provides that the "[c]ounty officers ... may be on a fee basis, salary basis, or fee basis supplemented by salary,” but that "[m]inimum compensation for said county officers may be established by the General Assembly by general law” and supplemented by local law or "if such authority is delegated by local law, by action of the county governing authority.” Ga. Const, art. IX, § 1, ¶ 3(b); see infra note 12. The State legislature thus also controls sheriffs' qualifications and minimum salary.

. Georgia's Constitution provides that the legislative "power granted to counties ... shall not be construed to extend to ... [a]ction affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority.” Ga. Const, art. IX, § 2, ¶ 1(c)(1). The Georgia Attorney General has stated that, under Georgia’s Constitution, county governing authorities lack even the authority to supplement the sheriff's salary "unless authorized by local law enacted by the General Assembly to supplement the salary.” Ga. Op. Atty. Gen. No. U97-19 (1997); see infra note 36.

.Although Warren involved a prior version of the Georgia Constitution, the same relevant language is in the current version of the Georgia Constitution. See Warren, 231 Ga. at 499, 202 S.E.2d 405. The plain language of Georgia’s Constitution makes the powers and duties of the constitutional sheriff’s office alterable by the Georgia legislature and unalterable by the county or its governing body.

. This case involves the acts of Deputy Sheriff Brown, who served as Sheriff Peterson's chief jailer. Sheriffs may assign their deputy sheriffs to work at the jail. See O.C.G.A. § 15-16-23; Wayne County v. Herrin, 210 Ga. App. 747, 751, 437 S.E.2d 793 (1993); Kendrick v. Adamson, 51 Ga.App. 402, 180 S.E. 647 (1935). In Wayne County, the Georgia court read the sheriff's power to hire and fire deputy sheriffs under O.C.G.A. § 15-16-23, together with O.C.G.A. § 36-1-21, to mean that the sheriff may appoint his deputies "at will,” but also may elect in writing to make their appointments subject to the county civil service system as prescribed by law in O.C.G.A. § 36-1-21. Wayne County, 210 Ga. App. at 752-53, 437 S.E.2d 793; see Brett v. Jefferson County, 123 F.3d 1429, 1434 (11th Cir. 1997) (stating deputy sheriffs in Georgia are at-will employees of the sheriff and concluding sheriff had failed to satisfy the statutory requirements in O.C.G.A. § 36-1-21 necessary for the sheriff to place his employees under the county civil service system).
Sheriffs also may appoint persons to serve as jailers who are not deputy sheriffs. See Tate v. Nat’l Sur. Corp., 58 Ga.App. 874, 876, 200 S.E. 314 (1938) (noting "[tjhere was no evidence that the jailer was also a deputy”). O.C.G.A. § 42-4-1 provides: "By virtue of *1312 their offices, sheriffs are jailers of the counties and have the authority to appoint other jailers, subject to the supervision of the county governing authority, as prescribed by law.” We likewise read O.C.G.A. §§ 42-4-1 and 36-1-21 together to mean that the sheriff may appoint his non-deputy jailers "at will” under O.C.G.A. § 42-4-1, but also may elect in writing to make their appointment subject to the county civil service system and thereby subject to county supervision as prescribed by law in O.C.G.A. § 36-1-21. In any event, this case does not involve a jailer who is not a deputy sheriff.

. The Georgia Attorney General also has explained that under Georgia law, sheriffs have statutory duties and also all of their common law duties and powers unless modified by statute, and that these duties include enforcing the laws and conserving the peace. See Ga. Op. Atty. Gen. No. 77-83 (1977); Ga. Op. Atty. Gen. No. U69-385 (1969) (both construing former Georgia Code § 24-2813 (1933), now O.C.G.A. § 15-16-10). In addition, sheriffs must be state-certified peace officers, who are "vested ... with authority to enforce the criminal or traffic laws through the power of arrest and [are charged with the] preservation of public order, the protection of life and property, and the prevention, detection, or investigation of crime.” O.C.G.A. § 35-8-2(8)(A).

. Other state actors available for law enforcement activity include the Georgia Bureau of Investigation and the Georgia State Patrol. See O.C.G.A. §§ 35-3-3 et seq.; §§ 35-2-30 et seq.

. While the State fulfills part of its policing functions through the sheriff's office, the Georgia legislature authorizes the county to fulfill policing functions through a county police force. County governing bodies may create "a county police force” through a resolution or ordinance of the particular county governing body followed by the approval of qualified county electors. O.C.G.A. § 36-8-1(b). Thus, a county-wide referendum is required before a county may create a county police force. Id. If the referendum passes, the county governing body controls the hiring and removal of its county police, including the county police chief, and may "abolish a county police force at any time.” O.C.G.A. § 36-8-2. County police officers are subject to the "direction and control of the county governing body.” O.C.G.A. § 36-8-5.

.For example, the State has assigned sheriffs the task of maintaining and entering warrant information into the statewide criminal information database. O.C.G.A. § 35-3-36; see Grech v. Clayton County, 335 F.3d 1326, *1314 2003 WL 21521761 (11th Cir.2003) (en banc) (concluding "as to the particular function at issue [entry and maintenance of warrant information], the sheriff is acting on behalf of the State and thus ... Clayton County is not liable [for the sheriff's conduct at issue]”).

. Throughout this opinion, the term "state courts” refers only to Georgia’s superior courts, which have exclusive jurisdiction over state felony cases, divorce cases, cases respecting title to land, and cases arising in equity. Ga. Const, art. VI, § 4, ¶ 1. Georgia's superior courts also have concurrent jurisdiction over misdemeanors and other civil cases. Ga. Const, art. VI, § 4, ¶ 1; O.C.G.A. §§ 15-6-8(1), 15-7-4.

. Just as county jails house state criminal offenders, county courthouses, funded and built by the county, house state superior courts and their judges. O.C.G.A. § 15-6-24. Although presiding in county courthouses, superior court judges perform state judicial functions.

. Superior court judges "are authorized and empowered to transfer the investigation by a grand jury from the county where the crime was committed to the grand jury in any other county in the State” in certain circumstances. O.C.G.A. § 15-12-82(a). When this transfer occurs, "[t]he sheriff and the clerk of the superior court of the county in which the crime was committed shall be qualified and authorized to perform the duties of such officers in the same manner as if there had been no change of venue.” O.C.G.A. § 15-12-82(d).

. In criminal cases, state courts may require witnesses to post bonds to ensure their appearance, O.C.G.A. § 17-7-26, and the sheriff *1315 is responsible for accepting bonds and ensuring that they come from a bonding company approved by the sheriff. O.C.G.A. § 17-7-27.

. On May 22, 2003, the Governor signed the Georgia Indigent Defense Act of 2003 (“the Act"), which amends O.C.G.A. Chapter 17-12 and O.C.G.A. § 15-16-27. H.B. 770, 147th Gen. Assem., Reg. Sess. (Ga.2003). The Act does not change the requirement in O.C.G.A. § 15-16-27(a) that sheriffs “deposit cash bonds held by the sheriff in one or more interest-bearing trust accounts.” However, pursuant to the amended § 15-16-27(b), effective December 31, 2003, sheriffs must remit the interest to the Georgia Public Defender Standards Council, a state agency, for distribution to the circuit public defender offices instead of to the Georgia Indigent Defense Council.

. See Howington v. Wilson, 213 Ga. 664, 665, 100 S.E.2d 726 (1957) ("It is apparent from [Georgia] statutes that the custody of a defendant, pending his trial under an indictment for a criminal offense, is in the sheriff of the county wherein the offense was committed. ...”); State v. Middlebrooks, 236 Ga. 52, 52-53, 222 S.E.2d 343 (1976) (defendant originally detained in City of Atlanta jail transferred to custody of the Fulton County Sheriff upon indictment).

. The state superior court has no authority to sentence a person convicted of a felony other than to the custody of the commissioner of the Georgia Department of Corrections, and the State has authority over the inmate on the place of confinement and on the computation of sentence. See Eubanks v. State, 229 Ga.App. 667, 667-68, 494 S.E.2d 564 (1997). The State may allow felons to remain in the county jail and reimburse the county. O.C.G.A. § 42-5-51 (b)-(c).

. See Helmeci v. State, 230 Ga.App. 866, 871, 498 S.E.2d 326 (1998) (stating that O.C.G.A. § 42-5-50(c) "is clearly couched in mandatory language, indicating that a trial court has no discretion in denying a request to remain in the county pending appeal”); O.C.G.A. § 42-5-50(b) (stating except as otherwise provided in O.C.G.A. § 42-5~50(c), the DOC shall assign the place of confinement for convicted felons).

. "The Department of Corrections will provide reimbursement to counties for cost of maintaining felony prisoners in the county jails after conviction and sentencing and before such prisoners are transferred to a place of confinement as directed by the Commissioner, Department of Corrections.” Ga. Comp. R. & Regs. § 125-2-4-,02(d) (describing reimbursement procedure and including felons remaining in county jail during appeal as inmates for which reimbursement may be obtained).

. See Clayton County v. Evans, 258 Ga. 146, 147, 366 S.E.2d 282 (1988) (noting "the General Assembly — aware of the problem of the existence of overcrowded state prisons — made provision in O.C.G.A. § 42-5-51(c) for the reimbursement to the county ... for the cost of incarcerating state prisoners”).

. The other locations include a "county correctional institution;” a "state probation detention center or diversion center;” or a "state correctional institution” if the "crime was committed ... within the confines of a state correctional institution.” O.C.G.A. § 17-10-3(a)(l)-(3). Under Georgia law, county jails are separate facilities from "county correctional institutions.” See O.C.G.A. § 42-5-53.

. In operating the jail, Sheriff Peterson also must carry out many state policies on how inmates are treated and jails are operated. The State regulates the preparation, service, and number of meals and inspects the jail periodically "to ensure against the presence of unsanitary conditions.” O.C.G.A. § 42-4-32(a)-(c). The State prescribes that a jailer shall not be "guilty of willful inhumanity or oppression to any inmate under his care and custody.” O.C.G.A. § 42-4-5. The State sets the minimum safety and security requirements for jails. O.C.G.A. § 42-4-31(a).
We do not contend that these statutory jail duties, by themselves, transform sheriffs into state officials. Instead, we mention these statutes as further evidence of how the duties of sheriffs in Georgia are governed by the State and not by county governing bodies. This background is relevant to our consideration of whether the sheriff is an arm of the state or the county in establishing force policy as to Manders.

. With respect to § 42-4-4(a)(3) transfers, the Georgia Supreme Court instructs that "[t]he legislature has vested the sheriff alone with the ... administrative authority to order such transfers” and that a state superior court may not order such a transfer sua sponte, although the sheriff would be required to carry out an order of the court if the issue of the unsafe conditions of the jail were properly before the court. In re Irvin, 254 Ga. 251, 253-54, 328 S.E.2d 215 (1985).

. Although a state felony inmate has a right to remain in the county jail during appeal under O.C.G.A. § 42-5-50(c), the sheriff may transfer that inmate to another jail if the sheriff's jail is unsafe. See Helmeci, 230 Ga. App. at 871, 498 S.E.2d 326 (concluding the "conditions authorizing transfer [under O.C.G.A. § 42-4-4(a)(3) were] not present” and "the trial court erred in denying Helme-ci’s motion to remain in the county jail pending the disposition of his appeals”).

. Sheriffs’ incarceration of offenders in the county jail, such as Manders, who are charged with state felonies and being prosecuted by the State of Georgia in state superior courts is a state function. The State requires that sheriffs not only transport state offenders to and from state superior courts and attend all sessions of those state courts, but also take custody of state offenders in county jails between those state superior court sessions. The State of Georgia has a Department of Corrections, a state agency, that operates state prisons and incarcerates felony offenders after conviction. But the existence of the Department of Corrections does not preclude the State from utilizing other law enforcement agencies, such as sheriffs, to perform part of the State's incarceration function for state offenders. As detailed above, the State requires sheriffs to take custody of state offenders, both pre- and post-conviction, in county jails, and counties have no law enforcement or other corrections authority over state offenders in county jails.
In fact, it makes sense for the State to utilize the network of county jails to incarcerate state offenders in the location of the state superior courts not only during pre-trial and trial, but also while the inmates serve state sentences during their appeals. Indeed, as explained above, the Department of Corrections can elect to have state offenders serve the entire state sentence in the county jail. That the State also operates state prisons and requires Clinch County to build and fund a county jail and to provide food, clothing, and medical necessities to inmates does not diminish the important state functions that Sheriff Peterson performs relative to state offenders, such as Manders, in the county jail.

. Griffin v. Chatham County, 244 Ga. 628, 261 S.E.2d 570 (1979), underscores how counties lack authority over sheriffs’ operation of county jails. In Griffin, the Georgia Supreme Court concluded that the sheriff must accept city prisoners only because a local act of the State legislature granted Chat-ham County power over the county jail and that County’s commission had contracted with the City of Savannah to maintain city prisoners in the county jail. Id. at 629-30. Griffin involved a local act by the State legislature that was applicable only to Chatham County. That local act granted the Chatham County commissioners considerable power over the county jail as follows: “Said Commissioners [of Chatham County] shall have power to make proper rules and regulations for the government and control of said jail of Chatham County, and the prisoners and inmates therein, and, except as hereinbefore provided, are hereby invested with the management and care of said jail.’’ Griffin, 244 Ga. at 630 n. 8, 261 S.E.2d 570 (quotation marks omitted) (alteration in original). In the present case, there is no similar local act by the State legislature regarding the Clinch County jail. Absent such a local act, counties are precluded from power or authority over sheriffs.

. The dissent raises a parade of hypothetical scenarios from the Chief of the Atlanta Police Department to a security guard watching the cosmetics counter at a department store. (Dissent, Barkett, J., p. 1334). Nowhere does this opinion in any way suggest or imply that a private security guard’s or a city or county police officer’s power to arrest or use force *1320 entitles that officer to Eleventh Amendment immunity. All certified peace officers in Georgia have certain arrest and force powers granted by the State. The key question is not what arrest and force powers sheriffs have, but for whom sheriffs exercise that power. A city delegates and exercises its policing function through its city police officers and a county through county police officers, and thus city and county police officers act for and represent the city and county, respectively. In contrast, the State delegates and performs certain state policing and corrections functions through several law enforcement agencies, including sheriffs, and sheriffs act for and represent the State in those assigned tasks. As explained previously, under Georgia law counties lack power in the area of law enforcement except to operate a county police force. See supra note 17.
What additionally makes sheriffs distinct from city and county police officers is that the State expressly has vested in sheriffs specific state functions and that sheriffs utilize their arrest and force powers in executing state functions. As detailed above, sheriffs perform a variety of specific state functions in the State's criminal justice system, from attending every session of state superior court, to taking custody of state offenders, both pre and post-conviction, in county jails. Sheriff Peterson’s authority over inmates and the duty to administer the jail flow from the State, not Clinch County, those functions and duties pertain chiefly to affairs of the State in Clinch County, and Clinch County plainly has no control or authority over Sheriff Peterson’s force policy at the jail or his deputies at the jail.

. The State prescribes the qualifications for sheriffs. The Georgia legislature has declared that "proper qualifications and standards be required of the ... sheriff so as to increase the effectiveness ... of the several sheriffs of this state as law enforcement officers to combat crime.” O.C.G.A. § 15 — 16—1(a). The State mandates a detailed set of qualifications that a person must satisfy to be a candidate for the sheriff's office in any county. See O.C.G.A. § 15 — 16—1(a)—(c).

. The Governor may determine that an investigation of a sheriff "should be made as a result of criminal charges, alleged misconduct in office, or alleged incapacity of the sheriff to perform the functions of his office.” O.C.G.A. § 15 — 16—26(a).

. A wholly separate statute, O.C.G.A. § 45-5-6, provides for removal of any public official upon a felony indictment. See Gipson v. Bowers, 263 Ga. 379, 434 S.E.2d 490 (1993) (stating that the Governor "can take no official action against a sheriff unless there has been a criminal indictment” first). The above Georgia statute, O.C.G.A. § 15-16-26, however, is not a law of general application to all public officials but independently addresses only sheriffs and the Governor's investigation and suspension of sheriffs for any misconduct in office, which do not require a criminal indictment or even any suspected criminal activity. Compare O.C.G.A. § 15-16-26, with § 45-5-6.

.The Governor necessarily acts through others in filing removal petitions, and the district attorney acts for the State in filing a petition to remove a sheriff. See Owens v. Fulton County, 877 F.2d 947, 951-52 (11th Cir.1989) (concluding district attorney acted for the State of Georgia and not Fulton County in prosecution decisions, even though elected by only Fulton County voters and although his office’s budget was provided in large part by county funds). The state judicial proceedings for removal of a sheriff are identical to those for the removal of a clerk of the superior court under O.C.G.A. § 15-6-82. O.C.G.A. §§ 15-16-10(b) & 42-4-4(c).

. It has been suggested that counties have more oversight than the State over the sheriff's operation of the jail because "county governing authorities have at their disposal the investigative powers of grand juries, see [O.C.G.A.] § 15-12-71(c) (2001), which must inspect jails annually and make appropriate recommendations to the county commission. [O.C.G.A.] § 15-12-78.” (Dissent, Barkett, J., p. 1341). This suggestion misapprehends these statutes and the well-established function of grand juries in the State's justice system.
Under Georgia law, the grand jury has two principal duties. First, the grand jury historically and functionally is a wholly independent investigating and accusing body in the State’s felony cases. O.C.G.A. §§ 15-12-61, 15 — 12— 71, 15-12-74, 15-12-82, 15-12-100. Second, the State vests in the grand jury the civil power and function of inspecting and investigating not just the county jail, but any county building, the county governing body itself, or any county commissioner. O.C.G.A. § 15-12 — 71(b)(2). Because the grand jury is independent and equally oversees county governing authorities, it cannot fairly be said that grand juries work at the counties’ disposal or act for counties in investigating sheriffs or county jails.
Instead, grand jurors, like sheriffs, are drawn from the county, paid with county funds, but perform discrete functions in the State's justice system. To the extent supervision exists, superior court judges in the state judicial system supervise grand juries. O.C.G.A. §§ 15-12-71 (a), 15-12-80, 15-12-100(a), 15-12-101. Superior court judges draw and impanel grand jurors, charge them, administer their oaths, and select their foreperson or direct the jury itself to select a foreperson. O.C.G.A. §§ 15-12-62, 15-12-68.
Given that many state offenders serve time in county jails, the State legislature also requires that grand juries each year "inspect the condition and operations of the county jail,” O.C.G.A. § 15 — 12—71 (b)( 1), and "the offices of the district attorney at least once in every three calendar years.” Id. The grand jury "may prepare reports or issue presentments based upon its inspections,” then filed in the superior court. O.C.G.A. §§ 15-12-71(b)(3), 15-12-80. At each annual § 15 — 12— 71(b)(1) inspection, O.C.G.A. § 15-12-78 requires that the grand jury make recommendations regarding heating and ventilation, which the county "shall strictly enforce,” and presentments as to the "treatment of the inmates.”

. We reject the arguments (a) that the State’s control over sheriffs represents nothing more than "its role as the seat of legislative power in Georgia” and its "sovereign prerogative to structure local government,” (Dissent, Barkett, J., pp. 1337-1338) and (b) that the State's control over sheriffs is "the kind of indirect and ultimate control ... reserved by the state with respect to every state-created entity.” (Dissent, Anderson, J. p. 1331). We fully recognize that ultimate control of every state-created entity resides with the State and that the State may destroy or reshape any political subdivision as it sees fit, including the sheriff's office. The key differences here are that the State of Georgia has structured Sheriff Peterson’s office as independent of Clinch County, that the State has vested in Sheriff Peterson specific state functions, that most of Sheriff Peterson's duties relate directly to, and are an integral part of, the State’s criminal justice system, and that the State can discipline directly Sheriff Peterson for any misconduct. That sheriffs act as to state matters (and not as to local government matters) is, in part, why counties, and cities too, have no power, authority, or control over sheriffs.

. The State pays the county the per diem rate for convicted state offenders in the county jail, and the county, in turn, funds the sheriff's budget. O.C.G.A. § 42 — 5—50(d); Ga. Comp. R. & Regs. § 125-2-4.02(d). The State requires the county to pay for pre-trial state offenders, but, once convicted, the State pays.

. We stress that this case does not involve medical care, which counties have a statutory obligation to provide to inmates in county jails. O.C.G.A. § 42-5-2. See, e.g., Epps v. Gwinnett County, 231 Ga.App. 664, 670, 499 S.E.2d 657 (1998) (Gwinnett County contracted with Prison Health Services, Inc.); Cherokee County v. North Cobb Surgical Assocs., 221 Ga.App. 496, 499, 471 S.E.2d 561 (1996); Macon-Bibb County Hosp. Auth. v. Houston County, 207 Ga.App. 530, 531-32, 428 S.E.2d 374 (1993) (concluding Houston County owed hospital for medical care provided to inmate in county jail).

. In Chaffin, the county, over the sheriff's objection, shifted the responsibility for patrolling and drug enforcement to the new county police department and reduced the sheriff's budget by forty-seven percent. 262 Ga. at 204, 415 S.E.2d 906. The trial court granted the county’s request for an injunction requiring the sheriff to cooperate in the implementation of the plan to transfer personnel and equipment to the newly created county police department. Id. at 202-03, 415 S.E.2d 906. The Georgia Supreme Court affirmed, holding that the trial court had not abused its discretion in finding that the remaining budget was sufficient to allow the sheriff to perform his duties. Id. at 204, 415 S.E.2d 906. In doing so, the Georgia Supreme Court reaffirmed that: (1) "Sheriff Chaffin is an elected, constitutional officer," Chaffin, 262 Ga. at 203, 415 S.E.2d 906 (citing Ga. Const, art. IX, § 1, ¶ 3(a)); (2) "[t]he sheriff is not an employee of the county commission,” Chaffin, 262 Ga. at 203, 415 S.E.2d 906 (citing Board of Commissioners of Randolph County v. Wilson, 260 Ga. 482, 396 S.E.2d 903 (1990)); and (3) although the county commission has the power to create its own county police force, " ‘the *1324 commissioners could not divest the sheriff of his power and duty to enforce the laws and preserve the peace,' ” either directly or indirectly by exercise of their fiscal authority or control of county properly, Chaffin, 262 Ga. at 203, 415 S.E.2d 906 (quoting Wolfe v. Huff, 232 Ga. 44, 45, 205 S.E.2d 254 (1974)).
In another budget battle between the sheriff and county commission in Board of Commissioners of Randolph County v. Wilson, the sheriff requested $70,000 to pay deputies, but the county commission budgeted a lump sum of only $60,080. 260 Ga. at 482, 396 S.E.2d 903. The Georgia Supreme Court held that the county commission did not abuse its authority, viewing the case as "involving the power of the commission to approve the sheriff’s budget rather than the power of the sheriff to hire deputies.” Id. at 484, 396 S.E.2d 903.

. Alabama sheriffs are elected by county voters, their budgets are paid from county funds, and their jurisdiction is limited to the borders of their respective counties. The Supreme Court found these factors insufficient to establish county control over sheriffs and decided that Alabama sheriffs act for and represent the State in their law enforcement duties. See McMillian v. Monroe County, 520 U.S. 781, 791, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) ("The county's payment of the sheriff’s salary does not translate into control over [the sheriff], since the county neither has the authority to change his salary nor the discretion to refuse payment completely.”). The Supreme Court concluded that the ability of the county governing body to reduce the sheriff's budget as long as the budget remains reasonable results in "attenuated and indirect influence over the sheriff's operations.” See id. at 791-92, 117 S.Ct. 1734. Although the analysis required on the Eleventh Amendment question is different from that for a § 1983 policymaker claim, the issue of control under state law is a relevant factor to both inquiries.
After noting that Alabama law cut both ways, the Supreme Court in McMillian concluded that Alabama sheriffs act for the State of Alabama, not the county, and then made this apt observation about Alabama law, which applies equally to Georgia law regulating its sheriffs: "We are not, of course, predicting that state law will always speak with perfect clarity.... It may not be possible to draw an elegant line that will resolve this conundrum.” McMillian, 520 U.S. at 793, 117 S.Ct. 1734 (quoting Praprotnik, 485 U.S. at 125, 126-27, 108 S.Ct. 915). This case exemplifies that axiom, and it also explains why we narrowly decide only that Georgia sheriffs in their official capacity act for the State in establishing force policy in the county jail and in training and disciplining their deputies in that regard.

. It is at the outset of its opinion in Hess that the Supreme Court discusses “current” Eleventh Amendment jurisprudence and its emphasis on "the integrity retained by each State in our federal system.” Hess, 513 U.S. at 39, 115 S.Ct. 394. The Eleventh Amendment’s role historically was to protect the State’s treasury from federal courts forcing the State to repay war debts. Id. The Court in Hess discussed the state treasury factor but only after first concluding that "[sjuit in federal court is not an affront to the dignity of a Compact Clause entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign; rather, the federal court is ordained by one of the entity’s founders.” Id. at 41, 115 S.Ct. 394. The Supreme Court continued its focus on the importance of the sovereign integrity of the State under the Eleventh Amendment and pointed out why the States' integrity was not compromised when a Compact Clause entity is sued in federal court, stating:
Nor is the integrity of the compacting States compromised when the Compact Clause entity is sued in federal court. As part of the federal plan prescribed by the Constitution, the States agreed to the power sharing, coordination, and unified action that typify Compact Clause creations. Again, the federal tribunal cannot be regarded as alien in this cooperative, trigo-vemmental arrangement.
Id. at 41-42, 115 S.Ct. 394. The Supreme Court further stressed that "federal courts are not alien to a bistate entity Congress participated in creating.” Id. at 47, 115 S.Ct. 394.
The Court in Hess focused on the state treasury factor, but only after it concluded that the sovereign integrity of the State was not implicated when a Compact Clause entity is sued in federal court. In stark contrast, because sheriffs act for and represent the State, not the county, in promulgating force policy at the jail, the State’s integrity is heavily involved in this case.

. Other than Regents and Hess, the only other recent Supreme Court discussion of the "arm of the State” doctrine in the Eleventh Amendment context is a footnote in Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). In Auer, the Supreme Court concluded that the St. Louis Board of Police Commissioners was not an arm of the state: although the Governor appointed four of the five members, "the city of St. Louis is responsible for the board's financial liabilities” and "the board is not subject to the State’s direction or control in any other respect.” Id. at 456 n. 1, 117 S.Ct. 905. In contrast to Auer, Clinch County is not liable for Sheriff Peterson’s acts, is not required to pay judgments against the Sheriff, and the State directs and controls the Sheriff in many respects.

. Wayne County Bd. of Comm’rs v. Warren, 236 Ga. 150, 152, 223 S.E.2d 133 (1976) (concluding that a county has no liability for the violations of the civil rights of any person by a county sheriff); Brown, 221 Ga.App. at 201, 470 S.E.2d 786 (reversing denial of summary judgment for Peach County because the Peach County sheriff, not Peach County, was the proper party to sue and noting that deputy sheriffs "were employees of the sheriff and not Peach County”); Lowe v. Jones County, 231 Ga.App. 372, 373, 499 S.E.2d 348 (1998) (concluding "deputy sheriffs are employees of the sheriff, not the county, and the county cannot be held vicariously liable as their principal”); Pettus v. Smith, 174 Ga.App. 587, 588, 330 S.E.2d 735 (1985) (affirming summary judgment for county board of commissioners and concluding, "[a]s the county commissioners had no control over the official duties of the deputy sheriff ..., they had no duty to determine whether a high-speed driving course rather than a defensive driving course was reasonably required to be supplied to deputy sheriffs”); Chadwick v. Stewart, 94 Ga.App. 329, 329-30, 94 S.E.2d 502 (1956).

. The statute quoted in Warren is former Georgia Code § 23-1502 (1933), which is now O.C.G.A. § 36-1-4. In the subsequent decision of Chatham County Commissioners v. Rumary, 253 Ga. 60, 315 S.E.2d 881 (1984), the Georgia Supreme Court held that the Chatham County Board of Commissioners was required to pay a judgment against a deputy sheriff for damages in an automobile collision because Chatham County’s own Code provided for the defense of the deputy at trial and payment of final judgments awarded in courts. Id. at 60-61, 315 S.E.2d 881. The Georgia Supreme Court emphasized that "[t]he nature of the [county] Board’s liability here is not that of respondeat superior [for the deputy sheriff’s acts], but exists solely by virtue of its voluntary and self-imposed obligation to provide indemnification for the acts of its employees committed during the performance of their duties.” Id. at 61, 315 S.E.2d 881. No evidence in this case suggests that Clinch County voluntarily has agreed to provide indemnification to Sheriff Peterson or his deputies. Further, the Supreme Court has instructed that indemnification does not re *1327 move the cloak of immunity. Regents, 519 U.S. at 430-31, 117 S.Ct. 900.

. Haywood v. Hughes, 238 Ga. 668, 235 S.E.2d 2 (1977), has been cited for the proposition that counties, by statute, are authorized to pay for the sheriff's legal costs in civil rights suits by third parties against sheriffs. See O.C.G.A. § 45-9-21. In Haywood, however, the Georgia Supreme Court emphasized that the statute authorizes counties to do so "in their discretion” and ”give[s] the county considerable latitude in determining what actions will be defended.” Id. at 669, 235 S.E.2d 2 (citing Ga.Code Ann. § 89-945, which is now O.C.G.A. § 45-9-21). In Haywood, the Glascock County Commissioners adopted a policy to pay attorney's fees in two specific suits against the sheriff. Id. Haywood demonstrates that Clinch County is not required to pay the sheriff's attorney's fees unless it elects to do so.

. Hess says that the state treasury factor is a "core concern” of Eleventh Amendment jurisprudence. 513 U.S. at 51, 115 S.Ct. 394. It is true that the presence of a state treasury drain alone may trigger Eleventh Amendment immunity and make consideration of the other factors unnecessary. Thus, this is why some decisions focus on the treasury factor. If the State footed the entire bill here, there would be no issue to decide.
The Eleventh Amendment, however, does not turn a blind eye to the state’s sovereignty simply because the state treasury is not directly affected. Moreover, the United States Supreme Court has never said that the absence of the treasury factor alone defeats immunity and precludes consideration of other factors, such as how state law defines the entity or what degree of control the State has over the entity. As mentioned earlier, although the state treasury was not affected, the Hess Court spent considerable time pointing out how that lawsuit in federal court did not affect the dignity of the two States because they had ceded a part of their sovereignty to the federal government as one of the creator-controllers of the Compact Clause entity in issue. If the state-treasury-drain element were always determinative in itself, this discussion, as well as the other control discussion, would have been unnecessary. See supra note 46.

. Never before has this Court discussed or decided en banc the particular issue in this case. We think that no panel actually has decided the question before this case. In prior § 1983 cases, we merely accepted official capacity suits against Georgia sheriffs as suits against their respective counties. See, e.g., Alexander v. Fulton County, 207 F.3d 1303, 1322 n. 14 (11th Cir.2000); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir.1999). In these cases, we did not decide whether, under Georgia law, sheriffs are agents for the State or the counties, and it does not appear the parties raised the question. To the extent that our prior decisions state or imply that Georgia sheriffs act for counties regarding the particular functions in issue — force policy and training and disciplining of deputies in that regard — we overrule those decisions.

. We are mindful of the Supreme Court's instruction that, before reaching an Eleventh Amendment issue, a court should address "the question [of] whether the statute itself permits the cause of action it creates to be asserted against States.” Vermont Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 779, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (emphasis in original). If sheriffs in their official capacity are arms of the state when exercising certain functions, then an issue arises whether Manders’s § 1983 suit is subject to dismissal on the independent ground that they are not "persons” for purposes of § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). This statutory issue, however, is not before us as it was neither briefed nor argued on appeal.

.It has been suggested that the sheriff's office is an independent, constitutional, elected office that is neither the State nor the county. (Dissent, Anderson, J., pp. 1331— 1332). Throughout this litigation the parties have briefed and framed the legal issue in this case solely as whether Sheriff Peterson in his official capacity acts on behalf of the State or Clinch County in the context of the Eleventh Amendment. Thus, we decide that controversy. No other issue is before us. In addition, while we agree that the sheriff's office is independent from and not controlled by the coun *1329 ty, we conclude today only that the sheriff acts for the State in performing the particular functions at issue in this case.